IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TRANSATLANTIC REINSURANCE CO., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No.: 14-cv-1535 |
| | ) | |
| NATIONAL INDEMNITY CO., | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF TRANSATLANTIC'S PETITION TO COMPEL ARBITRATION

Petitioner Transatlantic Reinsurance Company ("Transatlantic") submits this Memorandum of Law in Support of its Petition to Compel Respondent National Indemnity Company ("NICO") to arbitrate pursuant to 9 U.S.C. §4 (the "Petition"), and states as follows:

**I.      INTRODUCTION**

This matter arises out of a blanket casualty excess of loss reinsurance agreement effective January 1, 1985 (the "Reinsurance Agreement"), originally entered into between The Continental Insurance Company ("Continental") and Transatlantic. The Reinsurance Agreement provided that Transatlantic would indemnify Continental with respect to net excess liability accrued by Continental in a variety of classes of general and specialty casualty insurance business, as defined by Article I of the Reinsurance Agreement. Article XXII of the Reinsurance Agreement contains a broad arbitration provision requiring any dispute regarding the interpretation of the agreement to be submitted to arbitration.

On July 14, 2010, Continental entered into a separate transaction with a third party, National Indemnity Company ("NICO"), which is known and referred to herein as a "Loss

Portfolio Transfer" transaction ("LPT"). The LPT is comprised of a series of integrated agreements (the "LPT Agreements") whereby NICO assumed the ultimate economic responsibility for a portfolio of legacy asbestos and environmental liabilities incurred under numerous primary, excess and umbrella liability policies issued by Continental. Pursuant to the terms of the LPT Agreements, NICO assumed all rights with respect to the handling and resolution of these legacy liabilities. In turn, Continental assigned to NICO all rights with respect to any reinsurance for the legacy liabilities, and also assigned the right to pursue recovery actions under any applicable third party reinsurance agreements.

On March 14, 2013, through counsel, Continental demanded arbitration against Transatlantic under the Reinsurance Agreement, seeking to recover reinsurance for amounts that Continental has allegedly paid to certain policyholders for asbestos or environmental claims under certain policies issued by Continental. Since that time, Transatlantic has learned, through the publicly available LPT Agreements, that NICO has assumed the right to pursue recovery of reinsurance with respect to the asbestos and environmental claims at issue in the arbitration, and is therefore the real party-in-interest in that proceeding. Transatlantic has therefore requested that NICO be added as a party to the arbitration but NICO, through counsel, has refused to do so. Accordingly, Transatlantic has filed this Petition seeking to compel NICO to arbitrate under the Reinsurance Agreement. Allowing NICO to pursue this action "behind the scenes," without being bound by interim rulings that will be made by the arbitration panel, or by the final award that will eventually be entered, would be fundamentally inequitable and improper.

The LPT Agreements between Continental and NICO specifically incorporate by reference all of the terms and conditions of applicable third party reinsurance contracts, including the Reinsurance Agreement at issue in the arbitration. The arbitration provision contained in the

Reinsurance Agreement unambiguously requires arbitration for all disputes arising out of the interpretation of the agreement. As such, NICO is bound by the Reinsurance Agreement's arbitration provisions to the same extent as Continental would be.

Finally, under principles of estoppel, NICO cannot claim a direct benefit from the Reinsurance Agreement, yet refuse to participate in an arbitration required by the terms of the very same agreement. Accordingly, NICO is not entitled to collect proceeds under the Reinsurance Agreement, while avoiding the agreement's mandatory arbitration provisions. NICO must therefore be compelled to arbitrate.

## II. FACTUAL BACKGROUND

### A. Continental Enters Into a Reinsurance Agreement With Broad Arbitration Provisions

The ceding insurer, Continental, and the reinsurer, Transatlantic, entered into the Reinsurance Agreement effective January 1, 1985. A copy of the Reinsurance Agreement is attached to the Petition as Exhibit A. The Agreement reinsured a variety of general and specialty casualty classes of insurance business as defined in Article I. (See Ex. A, Art. I). The Reinsuring Clause (Article V) provides coverage in the amount of $5 million excess $5 million for each occurrence, except for occupational disease and business subject to aggregate limits, where coverage is $5 million aggregate net loss excess of $5 million aggregate net loss.

Article XXII of the Reinsurance Agreement provides that "…if any dispute shall arise between the COMPANY and REINSURERS with reference to the interpretation of this AGREEMENT or their rights with respect to any transaction involved, whether such dispute arises before or after termination of this AGREEMENT, such dispute, upon the written request of either party, shall be submitted to three arbitrators…". The term Company is defined as "The

Continental Insurance Company and any Company now or hereinafter affiliated with, controlled by or under common management with The Continental Insurance Company."

On March 14, 2013, Continental demanded arbitration against Transatlantic under Article XXII, seeking to recover reinsurance for amounts that Continental has allegedly paid under certain of its policies for asbestos or environmental claims. Transatlantic has denied that it is liable for the amounts claimed in the arbitration. An arbitration panel was selected, and an organizational meeting was held on October 29, 2013. At the organizational meeting, Continental was represented by counsel retained by NICO, and by an employee of a corporate affiliate of NICO's. No employee of Continental's appeared at the organizational meeting. To date, there have been no other proceedings held in the arbitration, and no substantive rulings have been made by the arbitration panel.

Transatlantic has demanded that NICO submit to the jurisdiction of the panel and participate as a party in the pending arbitration but NICO, through counsel, has refused. Most recently, on February 27, 2014 Transatlantic demanded that NICO participate as a party and be bound by the panel's orders. Transatlantic issued a written demand to that effect on February 27, 2014, attached to the Petition as Exhibit C. NICO, by letter dated March 3, 2014, attached to the Petition as Exhibit D, rejected Transatlantic's demand.

    **B.**    **Continental and NICO Enter Into The LPT Agreements, Which Incorporate the Terms of the Reinsurance Agreement, Including the Mandatory Arbitration Provisions**

The LPT, as currently understood by Transatlantic, consists of a series of agreements, commencing with a Master Transaction Agreement between Continental and NICO dated July 14, 2010, and also includes an Administrative Service Agreement, a Trust Agreement, a Parental Guarantee Agreement, and a Loss Portfolio Transfer Agreement, all dated August 31,

2010. (The LPT Agreements are attached to the Petition as Group Exhibit B). Through the vehicle of the LPT, Continental sought to remove its liability for legacy asbestos and environmental claims from its books by transferring those liabilities to NICO. In fact, when the LPT was publicly announced, the CEO of CNA Financial Corporation ("CNA"), the parent company of Continental, stated that, through the mechanism of the LPT, CNA had effectively eliminated all of its risk with respect to the transferred asbestos and environmental liabilities.[1] In exchange for assuming these legacy liabilities, Continental transferred to NICO its reserves for the subject losses, discounted to present value.

The Administrative Service Agreement between Continental and NICO (Administrative Service Agreement, Ex. B, pp. 15-16) provides for the administration of "Third Party Reinsurance Agreements," as that term is defined in the related Loss Portfolio Transfer Agreement with respect to "Business Covered." The term "Business Covered" is defined in pertinent part as all losses relating to asbestos and pollution claims. "Third Party Reinsurance Agreements" are defined as "reinsurance agreements…whereby any…CNA Insurer has ceded the Business Covered, and which agreements have not been voided or commuted." (Loss Portfolio Transfer Reinsurance Agreement, Ex. B, p. 11). Therefore, under the terms of the LPT Agreements, the Reinsurance Agreement at issue in the arbitration is a "Third Party Reinsurance Agreement which NICO has agreed and is contractually obligated to administer." *Id*.

Under the Administrative Services Agreement, NICO agreed to "administer and collect, on behalf of and in the name of the applicable Reinsureds, Third Party Reinsurance Recoverables and Other Recoveries due in respect of the Reinsured Liabilities **in accordance with the contractual terms of the applicable Third Party Reinsurance Agreements** and Reinsured

---

[1] *CNA Completes Transfer of Asbestos and Environmental Pollution Liabilities to National Indemnity Company*, August 31, 2010, http://investor.cna.com/phoenix.zhtml?c=104503&p=irol-newsAllArticle&ID=1465078&highlight= (January 29, 2014), attached hereto as Exhibit A.

Contracts…" (Administrative Services Agreement, Ex. B, p. 15)(emphasis added). Similarly, Article II of the "LPT Reinsurance Agreement" further states that NICO **"shall be subject in all respects to the same risks, terms, rates, conditions, interpretations, assessments and waivers…as are contained in the Third Party Reinsurance Agreements between CIC [Continental] and any of its reinsurers."** (LPT Reinsurance Agreement, Ex. B, p. 12) (emphasis added). These provisions plainly establish NICO's contractual obligation to administer the Reinsurance Agreement that is the subject of the arbitration with Transatlantic in accordance with all of the Reinsurance Agreement's provisions, including the mandatory arbitration article contained therein.

While Transatlantic disputes the validity of CNA's transfer of the underlying asbestos and environmental liabilities to NICO, for purposes of adding NICO as a party and binding NICO to the rulings of the arbitration panel and to the outcome of that proceeding, it is clear that NICO intended to assume and be "subject to" all of the terms of the Reinsurance Agreement, including the arbitration provision.

      C.    **Nature of the Dispute in the Arbitration**

At the crux of the dispute in arbitration is the LPT transaction between Continental and NICO. The LPT purported to retroactively transfer to NICO a portfolio of Continental's existing asbestos and environmental losses. Under Article IX of the Reinsurance Agreement, however, ceded loss is calculated based on Continental's net retention of the losses:

**Article IX- NET RETAINED LINES**

> Except as otherwise provided in ARTICLE X, ULTMATE NET LOSS, this AGREEMENT applies only to that portion of an insurance, reinsurance or any extra contractual obligations which the COMPANY retains net for its own account. In calculating the amount of any loss hereunder and also in computing the amount or amounts in excess of which this AGREEMENT attaches, only loss

or losses in respect of that portion of any extra contractual obligations which the COMPANY retains net for its own account shall be included.

Pursuant to this provision, only the portion of insurance, reinsurance or extracontractual obligations which Continental retains net for its own account may be used to calculate the loss for which Transatlantic is required to indemnify Continental. This provision insured that Continental would always have a financial stake in the ceded liabilities, such that the financial interests of Continental and Transatlantic would remain protected and aligned[2]. In this case, as a result of its entry into the LPT, Continental has not retained *any* losses, and has removed itself entirely from liability under the Reinsurance Agreement. The very purpose of the Net Retained Lines provision is to guard against the circumstances that have occurred here—a wholesale transfer of a ceding company's obligations. Thus, there can be no cedable losses which Transatlantic is obligated to pay.

In addition to running afoul of the foregoing express contractual provision, Continental has also breached the duty of *uberrima fides*, or utmost good faith, that is implied in every contract of reinsurance. The Continental/NICO LPT has fundamentally altered the relationship which lies at the heart of the Reinsurance Agreement, to Transatlantic's detriment. The prejudice to Transatlantic arising from the LPT arises in many contexts, but is perhaps seen most clearly through an understanding of its implementation. NICO and its designated claim handling agent Resolute Management, Inc. ("Resolute"), are strangers to the original reinsurance relationship who, in the course of implementing the LPT, have turned the process of adjusting and settling the underlying asbestos and environmental claims on its head.

---

[2] In the reinsurance industry, breach of loss retention provisions constitutes grounds for contract rescission. *Christiana Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*, 979 F.2d 268, 278 (2d Cir. 1982).

{00070692.DOC}    7

As a result of the LPT, Transatlantic's reinsured liabilities are no longer being handled by the insurer with which Transatlantic originally contracted, the interests of which were aligned with its own. Instead, NICO has entered into several similar LPT transactions with various insurers, including Continental but also including AIG, Lloyd's of London and several others. In each instance, NICO, a wholly-owned subsidiary of Berkshire Hathaway, Inc., has appointed Resolute, another Berkshire Hathaway company, to adjust and settle all of the legacy liabilities, including claims by multiple insureds against a variety of unrelated insurers arising from the same loss event, in which each party has conflicting interests. This has been referred to as a "claims blender," in which the ceding insurer's financial interests with respect to the handling and settlement of claims and the allocation of losses are no longer aligned with those of the reinsurer, depriving the reinsurer of the benefit of its bargain and resulting in severe prejudice to the reinsurer's interests.

This is especially problematic in the context of the asbestos and environmental claims which are the subject of the pending arbitration, because those claims involve complex declaratory judgment proceedings in which multiple insurers have asserted diverse coverage positions. It is the role of each insurer in such proceedings to vigorously assert its own particular coverage defenses, and to negotiate with other insurers and the insured to determine how coverage is triggered and allocated over multiple years and layers of coverage in an effort to minimize its own, and therefore its reinsurer's, liability. Such complex cases cannot be fairly and adequately defended when the same party, in this case NICO/Resolute, blends the handling of claims against multiple insurers.

These are the issues that lie at the core of the pending arbitration proceeding. Such defenses can only be effectively developed by Transatlantic if both Continental and NICO are parties to the arbitration.

### III. ARGUMENT

#### A. Applicable Law

Under the Federal Arbitration Act, arbitration may be compelled where there is a written agreement to arbitrate a dispute within the scope of the arbitration agreement, coupled with a refusal to arbitrate. *Zurich American Ins. Co. v. Watt Industries, Inc*., 417 F.3d 682, 686 (7th Cir. 2005). Non-signatories to an arbitration agreement may be bound by the arbitration agreements entered into by others through: (1) assumption; (2) agency; (3) estoppel; (4) veil piercing; and (5) incorporation by reference. *Id. Gersten v. Intrinsic Technologies, LLP,* 442 F.Supp.2d 573, 577-78 (N.D. Ill. 2006). Where it is undisputed that there is a valid agreement to arbitrate, and the issue is whether that agreement applies to a nonsignatory, federal precedent applying the FAA is applicable. *Id*. at 578.

The instant Petition should be granted as there is a written agreement to arbitrate all disputes concerning the interpretation of the Reinsurance Agreement originally entered into between Continental and Transatlantic. NICO is bound to the agreement's arbitration provision because it has assumed the Reinsurance Agreement, and because the Reinsurance Agreement has been incorporated by reference into the LPT Agreements between Continental and NICO. Moreover, because NICO is seeking a direct benefit from the Reinsurance Agreement, it is estopped from disclaiming its obligation to arbitrate.

B.  **The Arbitration Clause is Sufficiently Broad to Include Disputes between NICO and Transatlantic**

In considering the extent to which non-signatories to an arbitration agreement may be bound by its terms, courts have considered whether the agreement to arbitrate is sufficiently broad to allow disputes with non-signatories to be brought within its terms. *See Gersten v. Intrinsic Technologies, LLP,* 442 F.Supp.2d 573, 577-78 (N.D. Ill. 2006); *see also Clarendon Nat. Ins. Co. v. Lan*, 152 F.Supp.2d 506, 520 (S.D.N.Y. 2001). An arbitration clause is considered "broad" if it is not restricted to just the signatories of the agreement. *Clarendon,* 152 F.Supp.2d at 520. For instance in *Clarendon*, the court found that the arbitration clause was sufficiently broad because it provided for the arbitration of "any dispute arising out of [the respective agreements] or the enforcement hereof." *Id.* at 521. The court reasoned that using standard "arising out of" language was characteristic of a broad arbitration clause and could bind even non-signatories as long as the dispute arose out of the interpretation of the agreement containing the provision. *Id.*

Similarly in *Gersten*, the arbitration provision stating that "[a]ll disputes arising under or connection with" an agreement was also deemed sufficiently broad to bind a non-signatory. *Gersten,* 442 F.Supp.2d at 577. Courts typically find that an arbitration provision is sufficiently broad if it requires arbitration for matters "arising out of" or "in connection with" the interpretation of the agreement. *Id.* Arbitration clauses using this language are viewed as so broad that they are often referred to as "generic." *Id.; Northern Illinois Gas Co. v. Airco Indus. Gases*, 676 F.2d 270, 275 (7th Cir. 1982)(describing arbitration clause as broad where it concerned "all disputes, claims and other matters in question arising out of, or relating to" the agreement). Thus, as long as the provision provides for arbitration of all matters "arising out of"

the interpretation of the agreement, the arbitration provision is sufficiently broad to extend to non-signatories.

Here, the arbitration provision in the Reinsurance Agreement between Continental and Transatlantic provides for the arbitration of all disputes concerning the interpretation of the Reinsurance Agreement or any transaction involved. The dispute in the pending arbitration plainly involves the interpretation of the Reinsurance Agreement as well as a related transaction. As such, the arbitration clause in the Reinsurance Agreement is sufficiently broad to bind NICO to the provision.

      **C.    NICO is the Real Party-in-Interest in this Case and Should be Compelled to Arbitrate.**

Pursuant to the express terms of the LPT Agreements, the asbestos and pollution liabilities that are the subject of the arbitration demanded by Continental have been assumed by NICO. The LPT Agreements state that any rights to reinsurance recovery under third party reinsurance agreements have been "transferred" to NICO. Thus, NICO is irrefutably the real party-in-interest in the pending arbitration, not Continental. Yet, Continental is the only party who is currently before the arbitration panel, and as such is the only party obligated to provide discovery, and the only party who will be bound by the arbitration panel's interim rulings and the eventual final award in the case. This is inequitable and unjustifiable. Given that only NICO will benefit from the relief requested in the arbitration proceeding, it must be bound by the panel's rulings and the eventual final award to the same extent as Continental.

NICO's integral role in the arbitration was demonstrated at the initial organizational meeting held on October 29, 2013. Continental was represented at the meeting through counsel retained by NICO, and by an employee of Resolute, NICO's claim handling agent. The LPT Agreements expressly provide for NICO's handling of all legacy asbestos and environmental

claims going forward, including any resulting ceded reinsurance claims. NICO agreed to "administer and collect" all third party reinsurance, like the reinsurance at issue in the arbitration, and will be the sole beneficiary in the event recovery is made. The only logical conclusion to be drawn is that Continental is purportedly "collecting" reinsurance and participating in the present arbitration in name only. Accordingly, NICO should be compelled to arbitrate.

>    D.  **NICO Agreed to be Subject to the Arbitration Provision because the LPT Agreements Expressly Incorporate All the Terms of the Reinsurance Agreement, Including the Arbitration Provision**

According to the express terms of the LPT Agreements, NICO intended to assume the benefits of and be subject to all of the terms and conditions of the Reinsurance Agreement. This includes the arbitration provision. Under well-settled federal law, a separate contractual relationship with the signatory to an arbitration agreement is sufficient to bind a non-party to the agreement where the contract incorporates the existing arbitration provision. *Gingisss International, Inc. v. Bormet*, 58 F.3d 328, 332-33 (7th Cir. 1995); *Clarendon Nat. Ins. Co. v. Lan,* 152 F.Supp.2d at 520 (citing *Maritime S.A. v. Marinera*, *S.A.*, No. 96 Civ. 1888, 1999 WL 46721 at *5 (S.D.N.Y. Feb. 1, 1999)(collecting cases), *aff'd*, 201 F.3d 431 (2d Cir. 1999)).

NICO is thus bound by the arbitration provisions of the Reinsurance Agreement, and should be compelled to arbitrate in this matter, because it entered into the LPT Agreements with Continental, assuming the subject asbestos and pollution liabilities and the purported rights to reinsurance recoveries under the Reinsurance Agreement. NICO is subject to all of the same terms of the third-party reinsurance it purported to assume, including the Reinsurance Agreement's arbitration provisions.

In *Clarendon v. Lan,* supra*,* the court held as a matter of law that an arbitration provision contained in a reinsurance agreement was incorporated by reference into a subsequent

indemnification and guaranty contract with a non-signatory. *Id.* at 521. The court compelled the non-signatory to arbitrate because the subsequent contract referenced the agreement containing the arbitration provision even though it was completely silent with respect to arbitration. *Id.* at 520. Similarly, several other courts have deemed an arbitration provision incorporated by reference where a subsequent contract referenced an insurance agreement or other contract that contained an arbitration provision. *Gingiss v. Bormet,* 58 F.3d 328, 331-32 (7th Cir. 1995)(holding that where an agreement incorporated by reference all obligations under a specific contract, the party was also subject to the arbitration agreement contained in the contract); *see, Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 46 (2d Cir. 1999) (holding that an insurance policy incorporated by reference the Facultative Reinsurance Agreement which included an arbitration provision, when it stated "Subject to Facultative Reinsurance Agreement").

Here, it is indisputable that NICO purported to assume all of Continental's legacy asbestos and environmental claims and the subsequent claims for recovery under any applicable third party reinsurance contracts. Similar to the contracts in *Clarendon* and *Progressive*, the LPT Agreements entered into by NICO were silent as to arbitration, but were expressly subject to the provisions of the assumed third party reinsurance agreements, including the Reinsurance Agreement between Transatlantic and Continental. Specifically, NICO agreed to "be subject in all respects to the same risks, terms, rates, conditions, interpretations, assessments and waivers…" of the Third Party Reinsurance Agreements assumed. (See Loss Portfolio Transfer Agreement, Ex. B, p. 12). As such, NICO is bound by the arbitration provision contained in the Reinsurance Agreements and should be compelled to participate in the pending arbitration.

E.  **NICO is Estopped from Disclaiming its Obligation to Arbitrate While Claiming its Entitlement to Benefits Under the Reinsurance Agreement**

NICO should also be bound to the arbitration provision under principles of equitable estoppel. A party is estopped from avoiding arbitration if it knowingly seeks the benefit of the contract containing the arbitration clause. *Gersten*, 442 F.Supp.2d at 581-82; *Zurich American Ins. Co. v. Watts Industries, Inc.*, 417 F.3d 682 (7th Cir. 2005); *Indus. Elecs. Corp. of Wis. V. iPower Dist. Group,* 215 F.3d 677, 680 (7th Cir. 2000)(stating that a third-party beneficiary of a contract would be bound by its arbitration provision). The benefit must be derived directly from the agreement containing the arbitration provision. *Gersten*, 442 F.Supp.2d at 581; *Alfa Laval U.S. Treasury Inc. v. National Union Fire Ins. Co. of Pittsburgh*, 857 F.Supp.2d 404, 414 (S.D.N.Y. 2012).

In *Alfa Laval,* the non-signatories to an arbitration agreement were estopped from denying their obligation to arbitrate because the non-signatories were receiving direct benefits from insurance policies in the form of insurance coverage by virtue of a separate indemnification agreement that contained an arbitration clause. *Alfa Laval*, 857 F.Supp.2d at 414. The court reasoned that without the separate indemnification agreements the non-signatories would not have received the benefit of insurance coverage. *Id*. at 414-15. Thus, the non-signatories' efforts to obtain coverage under the policies at issue estopped them from claiming they were not bound by the arbitration provisions of those policies.

Here, NICO is attempting to derive a direct benefit from the Reinsurance Agreement because under the LPT Agreements it claims entitlement to all reinsurance recoveries for the legacy asbestos and environmental liabilities transferred to it by Continental. NICO expressly sought out the benefits of Continental's third party reinsurance agreements, including the Reinsurance Agreement at issue in the pending arbitration, when it negotiated the LPT

transaction. NICO is thus estopped from disclaiming its obligation to arbitrate under the Reinsurance Agreement, while at the same time claiming the benefits of the same agreement.

## IV. CONCLUSION

For all the reasons set forth above, Transatlantic respectfully requests that this Court grant its Petition to Compel Arbitration, including all of the relief requested in its Petition.


Dated: March 4, 2014  Respectfully submitted,

Transatlantic Reinsurance Company


By: /s/Mark A. Kreger
 One of its Attorneys

Mark A. Kreger
Scott A. Hanfling
Emily E. LeVert
KERNS, FROST & PEARLMAN, LLC
30 West Monroe Street, Suite 1600
Chicago, Illinois 60602
Telephone: (312) 261-4550
Fax: (312) 261-4565

*Attorneys for Transatlantic Reinsurance Company*